UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

**Sophie Tellier**

     v.                           Case No. 17-cv-184-PB
                                     Opinion No. 2018 DNH 143
**US Social Security Administration,
Acting Commissioner**

**MEMORANDUM AND ORDER**

Sophie Tellier challenges the denial of her application for disability insurance benefits pursuant to 42 U.S.C. § 405(g). She contends that the Administrative Law Judge ("ALJ") erred by failing to consider the limiting effects of her joint pain and degenerative knee condition in formulating her residual functional capacity ("RFC"). She also contends that the ALJ failed to adequately explain the persuasive weight given to her own subjective statements concerning her physical symptoms. The Acting Commissioner, in turn, moves for an order affirming the ALJ's decision. For the reasons that follow, I deny Tellier's motion and affirm the Commissioner's decision.

## I.    BACKGROUND

Tellier is a 57 year-old woman with a high school education. See Administrative Transcript ("Tr.") 62. She has previously worked as a pharmacy technician and teacher's aide. Doc. No. 12 at 1. Tellier has allegedly been disabled since

October 6, 2014,[1] due to a combination of Meniere's disease, systemic lupus erythematous, left-sided hearing loss, and an anxiety disorder.  See Tr. 44, 46-47.[2]

Tellier's application for benefits was initially denied in June 2015.  Her claim progressed to a hearing before ALJ Matthew G. Levin in August 2016, who ultimately denied her application. Doc. No. 12 at 1; see Tr. 44-53.  On March 16, 2017, the Social Security Administration (SSA) Appeals Council denied her request for review, rendering the ALJ's decision the final decision of the Acting Commissioner.  See Tr. 1-7.  Tellier now appeals.

## II.  **THE ALJ'S DECISION**

The ALJ assessed Tellier's claim under the five-step, sequential analysis required by 20 C.F.R. § 404.1520.  He ultimately ended the inquiry at step four after finding that she

---

[1] Tellier initially alleged that her disability began on October 27, 1961.  Tr. 184.  But, she later amended her alleged onset date to October 6, 2014.  Tr. 188; Doc. No. 12 at 1.  The ALJ's decision notes that the correct amended alleged onset date is October 6, 2014, Tr. 44, but the decision contains numerous typos stating that the alleged onset date is October 27, 1961. Tr. 44, 46, 53.  For the purposes of this appeal, I use the amended alleged onset date, October 6, 2014.

[2] In accordance with Local Rule 9.1, the parties have submitted a joint statement of stipulated facts, (Doc. No. 14). See LR 9.1. Because that joint statement is part of the court's record, I only briefly recount the facts here.  I discuss further facts relevant to the disposition of this matter as necessary below.

was not disabled during the period in question.[3]  At step one, he found that Tellier had not engaged in substantial gainful activity since October 6, 2014, her alleged disability onset date.  Tr. 46.  At step two, he found that Tellier had severe impairments of "Meniere's disease, systemic lupus erythematous, and left-sided hearing loss."  Id.  He also found that Tellier had the non-severe impairment of "anxiety disorder."  Tr. 46-47. In making the latter determination, the ALJ considered the "four broad functional areas" known as the "paragraph B criteria," and concluded that Tellier had no more than moderate limitations in "activities of daily living, social functioning, or concentration, persistence, or pace."  Tr. 47.[4]  He further noted, at step two, that Tellier's daily activities were consistent with a finding of no more than mild limitations in those areas.  Id.  Those activities included helping her husband get dressed and ready for work, preparing meals, performing chores, managing her finances, appointments, and medications, using the computer, and walking around the neighborhood.  Tr.

---

[3] Step four requires a finding of "not disabled" and a denial of the claimant's application "if the applicant's [RFC] is such that he or she can still perform past relevant work."  Purdy v. Berryhill, 887 F.3d 7, 10 (1st Cir. 2018).

[4] Tellier does not challenge this determination or any other aspect of the ALJ's decision as it pertains to her anxiety or any non-exertional functional limitations.  Doc. No. 9-1 at 4-10.

47-48.  At step three, the ALJ found that none of Tellier's
impairments, considered individually or in combination,
qualified for any impairment listed in 20 C.F.R. Part 404,
Subpart P, Appendix 1. Id.; see 20 C.F.R. § 404.1520(d),
404.1525, and 404.1526.

At step four, the ALJ determined that Tellier had the RFC
to perform "light work," as defined in 20 C.F.R. § 404.1567(b),
"except she should avoid exposure to all hazards, temperature
extremes, and loud background sounds."  Tr. 49.  In making his
determination the ALJ "considered all symptoms" as evidenced by
treatment notes, clinical examinations, Tellier's reported daily
activities, and her own subjective complaints.  See Tr. 49-52.
Symptoms of Tellier's Meniere's disease primarily included
severe episodes of vertigo and vomiting, described as occurring
once every two-to-three months, with "constant tinnitus."  Tr.
49, 51.  Her lupus produced fatigue, bilateral hand and finger
pain, "trace edema" in the hands and wrists, and aching in the
ankles and left knee.  Tr. 49-51.  Although the ALJ found that
Tellier's "impairments could reasonably be expected to cause the
alleged symptoms," he found that her "statements concerning the
intensity, persistence and limiting effects of [those] symptoms
[were] not entirely consistent with the medical evidence and
other evidence in the record."  Tr. 49.  Accordingly, he found
that her testimony on that point was "not fully persuasive."

Tr. 49.  He ultimately determined that the treatment notes
showed that Tellier's Meniere's disease was stable and that her
lupus was "well controlled with medication."  Tr. 51.  He noted
that nothing in the record warranted additional restrictions,
specifically pertaining to the frequency and severity of the
symptoms associated with each impairment during flares.  Id.

In light of the aforementioned RFC and testimony taken from
a vocational expert ("VE") at the hearing, the ALJ concluded
that Tellier was "capable of performing her past relevant work
as a pharmacy technician and a teacher's aide," as each
occupation only demands capabilities at a light exertional
level.  See Tr. 53, 85-86.  The VE had opined that a
hypothetical person of a similar age, education, and vocational
background to Tellier could perform both jobs notwithstanding
the limitations contained in her RFC.  Tr. 85-86.  Accordingly,
the ALJ concluded that Tellier had not been disabled from the
alleged onset date through the date of his decision.  Tr. 53.


### III.  STANDARD OF REVIEW

I am authorized to review the pleadings submitted by the
parties and the administrative record and enter a judgment
affirming, modifying, or reversing the "final decision" of the
Commissioner.  See 42 U.S.C. § 405(g).  That review is limited,
however, "to determining whether the [Commissioner] used the

proper legal standards and found facts [based] upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000). I defer to the Commissioner's findings of fact, so long as those findings are supported by substantial evidence. Id. Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [her] conclusion." Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)). If the Commissioner's factual findings are supported by substantial evidence, they are conclusive, even where the record "arguably could support a different conclusion." Id. at 770.

If, however, the Commissioner derived her findings by "ignoring evidence, misapplying the law, or judging matters entrusted to experts," her findings are not conclusive. Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam). "Issues of credibility and the drawing of permissible inference from evidentiary facts are the prime responsibility of the Commissioner, and the resolution of conflicts in the evidence and the determination of the ultimate question of disability is for her, not for the doctors or for the courts." Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018) (internal quotations and citations omitted).

## IV. <u>ANALYSIS</u>

Tellier alleges three errors with the ALJ's decision that she argues warrant reversal. Doc. No. 9-1. First, she contends that the ALJ's RFC determination is not supported by substantial evidence because it does not contain limitations related to her joint pain in her wrists, hands, and left knee. Second, but similarly, she argues that the ALJ's RFC is flawed because, in making his determination, he ignored the effects of her "degenerative knee condition" in combination with her lupus. Third, Tellier argues that the ALJ's credibility assessment of her own subjective complaints at step four was not sufficiently explained in the written decision. I address, and reject each of Nichols's arguments in turn.

## A.   <u>Failure to Account for Joint & Knee Pain in the RFC</u>

Tellier first argues that the ALJ failed to consider her joint pain and degenerative knee condition in finding that she had the RFC to perform "light work as defined in 20 C.F.R. § 404.1567(b)," with no "exposure to all hazards, temperature extremes, and loud background sounds." Tr. 49. She contends that the ALJ should have included additional limitations specifically pertaining to use of her hands, wrists, and knees. Doc. No. 9-1 at 4. As to what those limitations might have looked like, however, Tellier does not specify. For the reasons

discussed, I find her argument unpersuasive because the ALJ plainly considered her joint and knee pain at step four, and the resulting RFC is supported by substantial evidence.

A claimant's RFC is "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a). It must be crafted by the ALJ based on all relevant evidence in the record. 20 C.F.R. § 404.1545; see Lord v. Apfel, 114 F. Supp. 2d 3, 13 (D. N.H. 2000); Stephenson v. Halter, 2001 DNH 154, *2. In so doing, the ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" Stephenson, 2001 DNH 154, *2 (citing Social Security Ruling 96-8p, 1996 WL 374184 at *5 (July 2, 1996)). This is typically done by "piec[ing] together the relevant medical facts from the findings and opinions of multiple physicians," see Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987), but may sometimes incorporate "commonsense judgments about functional capacity" based upon those findings. Gordils v. Sec'y of Health & Human Servs., 921 F.2d 327, 329 (1st Cir. 1990). An ALJ's written decision, however, need not specifically address every individual piece of evidence in the record where it would be cumulative or unhelpful to the claimant's position. See Grenier v. Colvin, 2015 DNH 133 at *2; Lord, 114 F. Supp. 2d at *13; see also Rodriguez v. Sec'y of Health & Human Servs., 915 F.2d 1557, 1990 WL 152336, at *1

(1st Cir. 1990) (per curiam, table decision) ("An ALJ is not required to expressly refer to each document in the record, piece-by-piece.")

1. <u>ALJ's Consideration of Joint & Left Knee Pain</u>

Here, the ALJ clearly considered Tellier's joint pain at step four insofar as it was a symptom of her lupus diagnosis. To start, the ALJ found Tellier's systemic lupus erythematosus to be a severe impairment and repeatedly discussed it throughout her decision. Not only is joint pain a typical symptom of systemic lupus erythematosus, <u>Stedman's Medical Dictionary</u>, 1124 (28th Ed. 2006), but Tellier's hearing representative, Ronnie Seidenberg, specifically told the ALJ that Tellier's "joint complications [were] secondary to the lupus." Tr. 65. Accordingly, the ALJ appropriately considered the joint pain a symptom of her lupus and discussed it as such. Indeed, his step-four analysis specifically references symptoms of joint pain in the hands, wrists, and knees in discussing Tellier's lupus-related treatment notes. <u>See</u> Tr. 49-53. Moreover, this correlation between her joint pain and lupus diagnosis is plainly reflected in the treatment notes to which the ALJ cited.

For example, the earliest signs of any joint pain in the administrative record occurred in February 2015, when Tellier presented to Dr. Carolyn Crosby with "neuropathic" hand and finger pain described as "tingling" and "numbness." <u>See</u> Doc.

No. 12 at 2-3; Tr. 286.  At the time, Dr. Crosby, aware of

Tellier's lupus diagnosis, noted that the sensation was likely

due to a "lupus flare."  Tr. 287.  She prescribed medication,

and noted that "rheumatology" would hopefully be able to provide

a second opinion as to the cause of the pain in a few weeks.

See Tr. 287.  Indeed, this suspicion was later confirmed.  In

March 2015, Tellier met with her treating rheumatologist, Dr.

Alicia Zbehlik, to address the hand pain, "aching in the knees

and ankles," and elbow stiffness.  Tr. 468-69.  Dr. Zbehlik also

attributed the pain to Tellier's lupus, specifically a "recent

flare after stopping" previously prescribed medication,

hydroxychloroquine.[5]  Moreover, in March 2016, Dr. Zbehlik

completed a questionnaire regarding Tellier's systemic lupus

erythematosus diagnosis and her related functional capacity.

Tr. 474; Doc. No. 12 at 6.  She indicated that Tellier's lupus

only affected her musculoskeletal body system and her skin.  Tr.

474.  The only associated symptoms that Dr. Zbehlik noted were

joint pain and stiffness in the "hands, wrists, knees, [and]

ankles."  Tr. 474.  These notes are only a few examples,

however.  Other evidence of this symptomatic correlation between

her lupus and joint pain appears throughout the record.  Because

_____

[5] Ultimately Dr. Zbehlik determined that Tellier's lupus was "well
controlled on [medications]" and that she was doing well
overall.  Tr. 469.  She then arranged for a 6-month follow up
appointment.

the ALJ directly addressed these and other treatment notes throughout his step-four discussion, he clearly considered Tellier's joint pain as far as it was a symptom of her lupus.

Similarly, the ALJ clearly considered Tellier's left knee pain in the same manner. He plainly understood it to be a symptom of her lupus rather than a separate impairment unto itself and explicitly noted it as such. See Tr. 51 (quoting APRN Nolan's March 2016 treatment note that she had "left knee pain with full extension and flexion," AR 356). Substantial evidence supports that understanding, as seen in both the medical record and Tellier's own testimony. For example, "Dr. Zbehlik, [Tellier's] treating rheumatologist, completed a statement regarding [Tellier's] lupus" in March 2016 that named systemic lupus erythematosus as Tellier's sole relevant diagnosis. Tr. 52. As discussed, the report included her knees as joints "affected by pain and stiffness," Tr. 474, and treatment notes from an October 2015 exam noted that Tellier's left knee was "bothersome." Tr. 460. Moreover, Tellier herself confirmed at the hearing that her left knee was the knee that was "affected by the lupus." Tr. 83.

Tellier presents no evidence or expert opinion supporting the contention that her left-knee issue warranted independent consideration apart from that given to her lupus and associated joint pain. Instead, all she offers is a single x-ray from

December 31, 2015 showing "[m]ild degenerative changes of the left medial knee joint compartment and left patellofemoral joint." Doc. No. 9-1 at 9-10. No other evidence can be reasonably construed as indicating that her left-knee issue was distinct from her lupus symptoms. She argues that the ALJ's failure to specifically mention the x-ray means that he ignored her "degenerative knee condition in combination with [her] Lupus." Id. at 9.

But the ALJ is not required to specifically address every individual piece of evidence in his written decision where it would be cumulative. Grenier, 2015 DNH 133 at *2. As discussed, the ALJ thoroughly discussed Tellier's lupus throughout step four after finding it a severe impairment at step two. This included reference to her left-knee pain in particular, which Tellier informed him was "the knee that [was] affected by the lupus." Tr. 83. The ALJ was not required to specifically discuss the x-ray itself, as "there is a presumption that the ALJ has considered all of the evidence before him." See Quigley v. Barnhart, 224 F. Supp. 2d. 357, 369 (D. Mass. 2002). Nor must an ALJ discuss every piece of evidence individually. See Lord, 114 F. Supp. 2d at 13.

Even if Tellier's left knee pain would have been more appropriately considered a separate impairment unto itself, the ALJ's failure to label it as such is harmless because he

adequately considered its effect in his analysis.  It is, of
course, true that an ALJ must consider "the combined effect of
all of a claimant's impairments," regardless of whether those
impairments are classified as "severe." McDonald v. Sec'y
Health & Human Servs., 795 F.2d 1118, 1126 (1st Cir. 1986).  But
an ALJ is generally "given considerable latitude in how he or
she chooses to do so." Chabot v. U.S. Soc. Sec. Admin., 2014
DNH 067, *10.  For example, courts have routinely found
citations to medical evidence of a certain condition or
acknowledgement of pain in the ALJ's decision as sufficient to
demonstrate that he or she considered a particular impairment.
See Chabot, 2014 DNH 067, *10; Baker, No. 10-cv-454, 2011 WL
6937505, at *9 (D. N.H. Nov. 15, 2011).  And an ALJ's statement
that a claimant "[does] not have an impairment or combination of
impairments" that equal a listing at step three is generally
sufficient to demonstrate that he or she considered the combined
effects of the claimant's impairments. Wilson v. Barnhart, 284
F.3d 1219, 1224 (11th Cir. 2002); Loy v. Sec'y of Health & Human
Servs., 901 F.2d 1306, 1310 (6th Cir. 1990).  Here, the ALJ
repeatedly referred to Tellier's reported knee pain as it
appeared in the treatment notes,  Tr. 51-52, and explicitly
considered her "combination of impairments" at step three.  Tr.
48-49.  Nothing more is required.  See Wilson, 284 F.3d at 1224.

## 2. ALJ's RFC is Supported by Substantial Evidence

The question then becomes whether the ALJ's RFC determination was based on substantial evidence. I conclude that it was. The ALJ's RFC was formulated by appropriately weighing the various expert opinions contained in the record. He gave great weight to the only expert opinion on Tellier's functional capacity that the record contained: that of state consultative physician Dr. Hugh Fairly. On May 5, 2015, Dr. Fairly reviewed Tellier's medical records dating back to her alleged onset date. Tr. 98-100. He opined that she could lift and/or carry up to 20 pounds "occasionally," i.e. one-third or less of an eight-hour workday; lift and/or carry up to ten pounds "frequently," i.e. two-thirds or less of an eight-hour workday; and sit, stand, and/or walk for "about [six] hours" in an eight-hour workday. Tr. 99. He also opined that she must avoid all exposure to hazards, i.e. machinery, heights, etc. Tr. 100. Thus, the ALJ's finding that Tellier possessed the RFC to perform "light work, as defined in 20 C.F.R. [§] 404.1567(b)," Tr. 49, is substantially supported by Dr. Fairley's RFC opinion, as he essentially adopted that opinion. See 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds . . . a good deal of walking or standing, or . . . sitting most of the time with some pushing

and pulling of arm or leg controls."). The ALJ also gave great weight to the opinions of consultative examiner Dr. Peter Loeser. Tr. 52. Days before Dr. Fairley's review, on May 1, 2015, Tellier was examined by Dr. Loeser, regarding her vertigo and vomiting spells. Tr. 327-29. Although Dr. Loeser did not provide a function-by-function assessment of Tellier, as noted in the ALJ's decision, he physically examined her and reported no significant finding in any area. See Tr. 52, 329. Of particular relevance to the ALJ's RFC was Dr. Loeser's finding that Tellier possessed a "[n]ormal ability to sit and stand, step up and down, get on and off the examination table, remove and put back on shoes and socks, squat and rise from a squat, ambulate, and walk on toes and heels." Tr. 329. This is reasonably consistent with the performance of light work and provides further support for the ALJ's finding.

Although Tellier's medical record continued to develop over the seven months following Dr. Fairley's review and Dr. Loeser's examination, as noted in the ALJ's decision, the ALJ determined that the "additional treatment notes [did] not reflect any change or deterioration in [Tellier's] presentation." Tr. 53. He found that Dr. Fairley's opinion "remain[ed] consistent with and supported by the evidence of record in its totality . . . [and] not inconsistent with any other full function-by-function assessment in the record." Tr. 53. This determination was

entirely appropriate and is supported by substantial evidence.
See Ferland v. Astrue, 2011 DNH 169, *4 (record remains
materially unchanged where new evidence either reveals no
greater limitations or is arguably consistent with the prior
assessment). Although treatment notes postdating Dr. Fairley's
RFC reveal complaints of left-knee pain, sore wrists, and
bilateral hand pain, see Tr. 352, 460-62, similar complaints of
joint and knee pain appeared in treatment notes reviewed by Dr.
Fairley. See Tr. 373-375, 468.

There is no evidence that the more recent complaints of
pain demanded greater functional limitations than those captured
in Dr. Fairley's RFC. In fact, APRN Colleen Nolan, an examining
source, noted on December 31, 2015, that although Tellier had
reported "worsening" left knee pain over the previous month, her
pain was presently "better" and "manageable" under her then-
current medication regimen. Tr. 352. The ALJ explicitly
considered these notes in concluding that Dr. Fairley's opinion
remained consistent with and supported by the record in its
totality. See Tr. 51-53. He also considered other instances
where treating providers had described Tellier's lupus condition
as "well controlled" with medication. Tr. 51. This finding is
well supported by the record, as Dr. Zbehlik noted that
Tellier's lupus was "well controlled" in both March 2015 and
October 2015. See Tr. 461, 469. Thus, the ALJ was entitled to

ascribe great weight to Dr. Fairley's opinion because the treatment notes postdating his RFC assessment continued to document the same complaints of pain and clinical findings of which Dr. Fairley was already aware.  See Wenzel v. Astrue, 2012 DNH 117, *4-5.

Tellier also presents no expert opinion evidence that contradicts Dr. Fairley's opinion.  Nothing beyond her own subjective complaints supports a more restrictive RFC with additional functional limitations specifically pertaining to her joints or left knee, nor even the opinion of her treating rheumatologist support additional limitations.  As previously discussed, Dr. Zbehlik was asked to fill out a questionnaire in March 2016 regarding Tellier's lupus and her resulting functional capacity.   The ALJ explicitly considered this opinion.  Tr. 52.  He accurately noted, however, that although Dr. Zbehlik listed some symptoms of Tellier's lupus on the form, she expressly declined to provide any functional assessment for the lupus.  In doing so, Dr. Zbehlik noted that it was "beyond the scope of her practice" to answer questions relating to functional capacity.  Tr. 52, 475.  Among the areas of potential limitation she was asked to, but declined to, consider were "simple grasping," "pushing and pulling," and "fine manipulation."  Tr. 475.  Others related to the amount of weight Tellier could lift and how long she could sit and stand during

an eight-hour day.  Tr. 475.  The ALJ explained that this failure to "quantify how [Tellier's] symptoms limit[ed] her exertionally" entitled Dr. Zbehlik's opinion to "less than great weight."  Tr. 52.  This is the extent of the physical functional assessments contained in the record.  With no other opinion as to Tellier's functional capacity beyond Dr. Fairley's, the ALJ was not in a position to adopt a more restrictive RFC on any matter exceeding the scope of a commonsense judgment.  See Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 17 (1st Cir. 1996); Jenna v. Colvin, 2014 DNH 074, *4 (ALJ's finding that claimant was limited in use of his left hand was unsupported by substantial evidence where no credited medical opinion addressed hand limitations).  Thus, I find no error in the ALJ's RFC or in his supporting analysis.

B.    **Subjective Symptom Evaluation**

     Tellier next argues that the ALJ erred in finding that her subjective reports regarding the intensity, persistence, and limiting effects of her physical symptoms were less than fully persuasive.  She claims that the ALJ's evaluation was conclusory and failed to "recite" the seven factors an ALJ is directed to consider in conducting a subjective symptom evaluation under applicable regulations, administrative rulings, and case law.  I find Tellier's arguments unpersuasive for the reasons discussed.

In crafting a claimant's RFC, an ALJ must consider all of a claimant's alleged symptoms, such as pain and fatigue, and determine the extent to which those symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. §§ 404.1529(a); SSR 16-3p, 2016 WL 1119029, at *2 (Mar. 16 2016).  This involves a two-step inquiry.  Wenzel v. Astrue, 2012 DNH 117, *5-6.  First, the ALJ must determine whether the claimant has a "medically determinable impairment" that could reasonably be expected to produce his or her alleged symptoms. Id. at *5.  Secondly, the ALJ must then evaluate the "intensity, persistence, and limiting effects of [those] symptoms" to determine the extent to which they limit the claimant's ability to perform work-related activities.  SSR 16-3p, 2016 WL 1119029, at *4.  The ALJ must "examine the entire case record" in conducting this evaluation, including the objective medical evidence, the claimant's own statements and subjective complaints regarding his or her symptoms, and any other relevant statements or information the record may contain.  Id. at *4; see Coskery v. Berryhill, 892 F.3d 1, 4 (1st Cir. 2018) (quoting SSR 16-3p, 82 Fed. Reg. 49462 (Oct. 25, 2017) (republished without substantial change)).

When a claimant's statements are inconsistent with the objective medical evidence, an ALJ must evaluate the veracity of a claimant's own descriptions of the "intensity, persistence,

and limiting effects" of his or her symptoms. See Floyd v. Berryhill, 2017 DNH 114, *5; SSR 16-3p, 2016 WL 1119029, at *3. The ALJ cannot reject the veracity of the claimant's own statements, however, based solely on the conclusion that they are unsubstantiated by the objective medical evidence. 20 C.F.R. § 404.1529(c)(2); see Clavette v. Astrue, No. 10-cv-580, 2012 WL 472757, at *9 (D. N.H. Feb 7, 2012); Valiquette v. Astrue, 498 F. Supp. 2d 424, 433 (D. Mass. 2007). Rather, any inconsistency between the subjective complaints and the objective medical evidence is just "one of the many factors" to consider in evaluating what weight to ascribe the claimant's statements. SSR 16-3p, 2016 WL 1119029, at *5; see Makuch v. Halter, 170 F. Supp. 2d 117, 127 (D. Mass. 2001).[6]

---

[6] The principle that an ALJ may not rest a negative credibility assessment solely on the lack of corroborating objective medical evidence was developed under application of Social Security Ruling ("SSR") 96-7p. See, e.g., Makuch, 170 F. Supp. 2d. at 126-127; Ault v. Astrue, 2012 DNH 005, at *5. This ruling has since been replaced by SSR 16-3p. See Coskery, 892 F.3d at 4; SSR 16-3p, 2016 WL 1119029, at *1. SSR 96-7p had been construed to only require an ALJ to assess a claimant's "credibility" in the event his or her subjective statements were unsubstantiated by the objective medical record. See Guziewicz v. Astrue, 2011 DNH 010, *6. Therefore, it would have been conclusory and legal error for the ALJ to discredit a claimant's statements based solely on the lack of corroborating objective evidence. See Clavette, 2012 WL 472757, at *9. In enacting SSR 16-3p to replace SSR 96-7p, the SSA primarily sought to "eliminate the use of the term credibility from the sub-regulatory policy to make clear that subjective symptom evaluation is not an examination of an individual's character." Coskery, 892 F.3d at 6 (citing SSR 16-3p, 82 Fed. Reg. at 49463) (internal quotations omitted); SSR 16-3p, 2016 WL 1119029, at *1 n.1. Despite that

Other factors the ALJ must consider, known as the "Avery factors" in the First Circuit, include (i) the claimant's daily activities;(ii) the location, duration, frequency, and intensity of the pain or symptom; (iii) any precipitating and aggravating factors; (iv) the effectiveness of any medication currently or previously taken; (v) the effectiveness of non-medicinal treatment; (vi) any other self-directed measures used to relieve pain; and (vii) any other factors concerning functional limitations or restrictions. 20 C.F.R. 404.1529(c)(3); Childers v. Colvin, 2015 DNH 142, *5 (citing Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 29 (1st Cir. 1986)). But "an ALJ need not address every Avery factor" in his written decision for his evaluation to be supported by substantial evidence. Ault, 2012 DNH 005, at *5. Instead, the decision need only "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how [the ALJ] evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029, at *9 (emphasis added); Anderson v. Colvin, 2014 DNH 232, *7.

_____

stylistic change, SSR 16-3p is materially the same as its predecessor, and it explicitly precludes an ALJ from "evaluat[ing] an individual's symptoms based solely on objective medical evidence." See SSR 16-3p, 2016 WL 1119029, at *4.

Here, the ALJ did not err in finding Tellier's own statements regarding her symptoms less than "fully persuasive." In his written decision, the ALJ summarized Tellier's hearing testimony as stating that she was "unable to manage the demands of work on a regular and full time basis," that she "has to lie down for two hours a day," and that she could not drive.  Tr. 49.  See Tr. 74, 80.  The ALJ understood that these deficits were allegedly due to her "significant fatigue, constant tinnitus, headache, swollen hands, and episodes of dizziness [involving] vomiting and fatigue."  Tr. 49.  The ALJ determined that if her testimony had been fully persuasive, Tellier would be limited beyond the light exertional level reflected in his RFC determination.  Id.  He ultimately concluded that her testimony was "not fully persuasive," however, finding that her described restrictions were inconsistent with the "deficits or abnormalities" described in the record, and because no treating or examining source had suggested that she was limited beyond the light exertional level.  See Tr. 49-50.  He concluded that Tellier's "treatment notes, clinical examinations, and daily activities" reflected an ability to engage in light exertional work.  Tr. 49.

First, it is well established that rote recitation of the Avery factors is not required in this type of evaluation.  See, e.g., Ault, 2012 DNH 005, *5; Matos v. Astrue, 795 F. Supp. 2d

157, 164 (D. Mass. 2001) ("[A]s a matter of law, the ALJ is not required to address all of the Avery factors in his decision"). As long as the Avery factors are explored during the administrative hearing and the ALJ provides specific reasons for any adverse credibility assessment, the ALJ complies with Avery and his findings are entitled to deference. See Lopes v. Barnhart, 372 F. Supp. 2d 185, 192-193 (D. Mass. 2005); Floyd v. Berryhill, 2017 DNH 114, *5 (quoting Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987). Here, reading his written decision as a whole, and considering the underlying hearing transcript, the ALJ did just that. He specifically discussed all of the relevant Avery factors at some point in his analysis, and inquired into those not explicitly addressed at the hearing.

For example, the ALJ specifically identified evidence of Tellier's daily activities as undermining her subjective claims of fully debilitating symptoms. See Tr. 49. Although he did not immediately expand on that specific reason in his step-four analysis, he did so elsewhere in his decision. For instance, at step two, he had already determined that her daily activities showed "largely unaffected functioning." Tr. 47. There he found Tellier's daily activities included helping her husband get dressed and ready for work, using an exercise ball to warm up her hands, making the bed, doing the dishes, getting coffee

and breakfast, using the computer and "keep[ing] busy" with chores and feeding the animals. Tr. 47-48, 323-324. He also recounted her statements that she took "walks around the neighborhood" and "prepare[d] meals." Tr. 48, 323-324. The ALJ also later noted that "despite [Tellier's] reports of dizziness, [she] continues to operate a motor vehicle." Tr. 51. Tellier even drove herself to the hearing in August 2016. Tr. 65. The ALJ later noted that these daily activates were inconsistent with her testimony and indicative of an ability to engage in light work. Such an explanation provides a sufficiently specific reason for the less-than-fully-persuasive weight given to her testimony. See, e.g., Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010) ("While a claimant's performance of household chores or the like ought not be equated to an ability to participate effectively in the workforce, evidence of daily activities can be used to support a negative credibility finding.").

Moreover, the ALJ also discussed the duration and frequency of symptoms associated with Tellier's lupus and Meniere's throughout his step-four analysis, and read her treatment notes as indicating that both impairments were stable and well-controlled with medication. Tr. 51. Indeed, substantial evidence suggests that both conditions largely occurred in "flares," only affecting Tellier on some days with varying

severity.  Tr. 51; see, e.g., Tr. 362, 414.  He also repeatedly

discussed some of the medications that apparently kept Tellier's

symptoms at stable levels, see Tr. 50-52, and confirmed the lack

of any associated side effects at the hearing.  See Tr. 50-52,

83.  Ultimately, he determined that the treatment notes and

clinical findings did not suggest that the severity of her

symptoms during flares warranted additional work-related

restrictions.  Tr. 51.  Those findings are substantially

supported by the record, as treatment notes and Tellier's own

subjective statements contained therein consistently reported

"manageable" pain, see 352, that was "well controlled" with

medication.  See Tr. 327, 329.  These reasons are sufficiently

specific to enable any reviewer to adequately assess the ALJ's

evaluation process.  They are supported by substantial evidence

for the reasons discussed, and are therefore entitled to

deference.  See Nadeau v. Barnhart, 2003 DNH 083, *5-6; SSR 16-

3p, 2016 WL 1119029, at *9.  Accordingly, I find no error.


## V.  CONCLUSION

Because I find that the ALJ's RFC is supported by

substantial evidence and that he derived his findings

appropriately, for the reasons set forth above, I grant the

Acting Commissioner's motion to affirm (Doc. No. 11), and I deny

25

Tellier's motion to reverse and remand (Doc. No. 9).  The clerk

is directed to enter judgment accordingly and close the case.

SO ORDERED.


                              /s/Paul Barbadoro_____
                              Paul Barbadoro
                              United States District Judge

July 10, 2018

cc:  Robert J. Rabuck, Esq.
     D. Lance Tillinghast, Esq.